326 F.3d 303
 Gary CERASO, Plaintiff-Counterclaim-Defendant-Appellee,
v.
MOTIVA ENTERPRISES, LLC, Star Enterprises, Inc., Texaco, Inc., Star Enterprise and Equiva Services, LLC, Defendants-Counterclaimants-Appellants.
 Docket No. 02-7126.
 United States Court of Appeals, Second Circuit.
 Argued: December 12, 2002.
 Decided: April 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED John J. Morgan, Stamford, Connecticut (Albert J. Barr, Barr & Lacava, Stamford, Connecticut, on the brief) for Plaintiff-Counterclaim-Defendant-Appellee.
 Sheila A. Huddleston, Hartford, Connecticut (Paul D. Sanson, Alexandra M. McHugh, Shipman & Goodwin, Hartford, Connecticut, on the brief), for Defendants-Counterclaimants-Appellants.
 Before: NEWMAN, KEARSE, and SACK, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 Defendants Motiva Enterprises, LLC, et al. (collectively "Motiva"), appeal from a judgment entered in the United States District Court for the District of Connecticut following a bench trial before Peter C. Dorsey, Judge, in favor of plaintiff Gary Ceraso, franchisee of a Texaco service station, enjoining defendants under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq. (2000), from terminating, failing to renew, or interfering with Ceraso's Texaco franchise. The district court found that Motiva had failed to show that Ceraso's operations gave it grounds under the PMPA for termination of the franchise. On appeal, Motiva contends that the district court erred in failing to find that Motiva properly terminated the franchise either (a) on the ground that Ceraso violated "image" provisions of the franchise agreements, or (b) on the ground that Ceraso violated local zoning regulations. For the reasons that follow, we find no basis for reversal, and we affirm the judgment.
 
 I. BACKGROUND
 
 2
 Ceraso operates, inter alia, a Texaco gasoline station and an auto repair shop at 350 Jennings Road in Fairfield, Connecticut ("Fairfield" or the "Town"), pursuant to a lease ("Lease") and a sales agreement ("Sales Agreement") with Motiva. There is no dispute that Ceraso is a franchisee and Motiva is a franchisor within the meaning of the PMPA. The facts pertinent to the present dispute, largely as found by the district court or as stipulated by the parties, included the following.
 
 
 3
 A. The Franchise Agreements and Ceraso's Operations
 
 
 4
 The Lease authorizes Ceraso, as "Lessee," to use the property "solely for the retail sale of Texaco-branded motor fuels, petroleum products and services, convenience items, and food and beverage items." (Lease § 9(a).) Section 9(b) of the Lease states, in pertinent part, that the
 
 
 5
 Lessee shall not use nor allow the use of the Leased Properties for any unlawful, offensive, hazardous, unsightly or other objectionable purpose, and shall not violate or permit any of its employees or invitees to violate any applicable federal, state, or local law, regulation or ordinance.
 
 
 6
 (Lease § 9(b) (emphasis added).) Similarly, the Sales Agreement requires the franchisee to comply with various provisions of federal, state, and local law. (See Sales Agreement § 21.)
 
 
 7
 The Sales Agreement, defining Ceraso as "Purchaser," also states, inter alia, that "Purchaser's operations shall be conducted at the Retail Facility in accordance with the standards set forth in the attached ... `Minimum Standards'[]." (Sales Agreement § 16(b).) The Minimum Standards section states, in pertinent part, that
 
 
 8
 Purchaser shall continuously maintain the Retail Facility, inside and out, including building, signs, restrooms, driveways, grass, planting areas, storage areas and any automotive equipment, in good, clean, neat, safe, secure, uncluttered, unobstructed, healthful, orderly, painted, operative and first class condition and in accordance with all applicable laws, rules and regulations.
 
 
 9
 (Sales Agreement, Minimum Standards Section (emphases added).) The Sales Agreement permits Motiva to terminate that agreement or to fail to renew the franchise "[i]f Purchaser, its employees, agents or invitees, violate the covenants of or fail to comply with the provisions of the Minimum Standards Section." (Sales Agreement § 28(m).)
 
 
 10
 Ceraso's business on the leased premises includes the sale of gasoline and related products, the operation of a modest convenience store, the repair of motor vehicles, and the operation of a towing service. From September 1999 through September 2000, Ceraso owned as many as 12 towing or service-related vehicles. From December 1999 through September 2000, he provided towing services for a number of institutional entities.
 
 
 11
 For his operations, Ceraso had received in February 1992 a special zoning exception permit pursuant to the Zoning Regulations of the Town of Fairfield, Connecticut ("Town Zoning Regulations"). The permit requires compliance with § 27.4.8.5 of those regulations (the "Regulation"), which provides, in pertinent part that
 
 
 12
 no more than five (5) motor vehicles awaiting repair work or having been repaired are to be stored or parked on the lot out-of-doors, unless such motor vehicles are located in an area suitably screened from streets and adjoining property in such a manner as to conceal the area from view to a height of five (5) feet with fences, walls or embankments in combination with other landscaping....
 
 
 13
 Town Zoning Regulations § 27.4.8.5.
 
 
 14
 B. Criticisms of Ceraso's 1999-2000 Operations
 
 
 15
 In December 1999, the Town Zoning Office, having received complaints about the condition of Ceraso's service station, issued to Ceraso an order to comply with the Fairfield Regulation. That order stated, in part, that Ceraso was in violation of the Regulation for "storing an inordinate number of vehicles on the premises, which creates many safety hazards," and that in order to establish compliance Ceraso must "reduce the number of unscreened vehicles to five or fewer." (Attachment to Town Zoning Office Order To Comply, dated December 17, 1999 ("Order To Comply").)
 
 
 16
 In March 2000, Robert Ascher, who had just become Motiva's sales representative for the area that included Ceraso's station, visited Ceraso's station and observed 25-35 vehicles parked on the premises. That total did not include cars that were screened or in a repair bay or that appeared to belong to transient customers. Ascher testified at trial that he commented to Ceraso that there were "a lot of cars here" but that he said nothing more as to the appearance of the premises. (Trial Transcript November 6, 2001, vol. II, at 74.) Ascher visited the station two or three more times before August 2000; on each occasion, he observed conditions similar to those of his first visit and suggested to Ceraso that some of the cars be moved.
 
 
 17
 On August 4, 2000, Ascher conducted an image evaluation of the station, making notes of his observations. He attempted to discuss the conditions with Ceraso, asking why so many cars were present. At some point, Ceraso apparently took umbrage and ordered Ascher to leave the premises. Ascher did not give Ceraso a copy of the evaluation notes.
 
 
 18
 In the meantime, Fairfield zoning enforcement officer Peter Marsala had observed Ceraso's premises on several occasions, and the Town Zoning Office eventually sent Ceraso a final warning letter dated September 12, 2000. The letter indicated that if Ceraso failed to bring his operations into compliance with the Regulation, a civil fine would be imposed and his special exception permit would be revoked. A copy of that letter was sent to Motiva, as Ceraso's franchisor.
 
 
 19
 Shortly thereafter, in light of the Town's September 12 letter and Ascher's August 4 image evaluation, Motiva sent Ceraso a letter, by certified mail, stating, in pertinent part, as follows:
 
 
 20
 It has come to our attention that the Town of Fairfield, CT has issued an Order to Comply ("Order") dated 12/17/99 because you have had more than 5 vehicles stored or parked on the lot. Moreover, you ignored the Order and continued to violate the Town's regulation which necessitated the Town's attorney to send you a letter on 9/12/00 demanding immediate compliance or face civil penalties of up to $2,500, in addition to revocation of the special exception permit....
 
 
 21
 Your continued failure to respect the Order to Comply for over 9 months evinces blatant defiance of the local laws. As you are no doubt aware, your Lease and Agreement require you to abide by all applicable laws in the operation of your business. Termination of the franchise and franchise relationship is permitted under the Petroleum Marketing Practices Act ("PMPA") for your knowing failure to comply with federal, state or local laws or regulations relevant to the operation of the marketing premises. See Article 18.1(c)(11) of Part II of your Agreement.
 
 
 22
 Additionally, upon a recent inspection of your facility, the following image violations were identified:
 
 
 23
 — Weeds along the building and at the ID sign
 
 
 24
 — Unkempt, unswept and obstructed bays
 
 
 25
 — Unregistered vehicles
 
 
 26
 Demand is hereby made that you immediately satisfy both the image violations and the Town of Fairfield demands to prevent closing of the station by the Town and termination of your franchise at the subject location. Your failure to comply with this demand will put your franchise relationship in jeopardy of termination.
 
 
 27
 (Letter from Motiva to Ceraso dated September 18, 2000 ("September 18 Letter"), at 1.) There is no dispute that Ceraso received this letter. Ascher subsequently visited the premises in September and November; on each occasion, he observed that the number of cars had not changed.
 
 
 28
 On October 19, 2000, Marsala applied to the Town Zoning Board of Appeals ("ZBA") for revocation of Ceraso's special exception permit (the "Revocation Application"). That application stated, inter alia, that in December 1999, Marsala had
 
 
 29
 issued Mr. Ceraso an Order to Comply with § 27.4.8.5. Specifically, Mr. Ceraso was to reduce the number of unscreened vehicles on the property to five or fewer. He has failed to comply with my Order....
 
 
 30
 (Attachment to Revocation Application at 1.) On November 2, 2000, the ZBA held a public hearing on that application, attended by, inter alios, Ascher, Marsala, Ceraso, and Ceraso's attorney. At the conclusion of the hearing, the ZBA, without making any specific findings, voted to revoke Ceraso's special exception permit.
 
 
 31
 Ceraso appealed the decision to state court, see Ceraso v. Zoning Board of Appeals, Docket# CV-00-0379051S. That appeal had not been resolved by the time the present action was tried in the district court. Ceraso later asked the district court to take judicial notice that the matter had been settled and that his permit was not revoked.
 
 
 32
 C. Motiva's Attempt To Terminate the Franchise
 
 
 33
 By letter dated November 13, 2000, Motiva sent Ceraso a "Notice of Termination of G-77C Lease" (the "Termination Letter"). The letter stated, in pertinent part, that
 
 
 34
 the Lease and Agreement and your franchise relationship with Motiva will be terminated effective February 17, 2001, under the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. Sec. 2801, et seq. ("the Act"). This action is being taken for the following separate and distinct reasons:
 
 
 35
 1. Your knowing failure to comply with applicable laws and regulations relevant to the operation of the marketing premises, namely your receipt of an Order to Comply dated 12/17/99 issued by the Town of Fairfield, CT ("Town") because you had more than 5 vehicles stored or parked on the lot.... Following an order to show cause hearing before the Town Board of Zoning Appeals on November 2, 2000, at which you appeared with counsel, your special exception permit was revoked.
 
 
 36
 2. Your failure to abide by the conditions of the Town special exception permit by having too many vehicles parked on the marketing premises which is also in violation of Section 9(b) of your Lease and Section 21 of your Sales Agreement. The affected provisions of your agreements with Motiva are both reasonable and of material significance to the franchise relationship.
 
 
 37
 3. Your failure to exert good faith efforts to carry out the provisions of the franchise, namely your continued practice of parking too many vehicles on the marketing premises after the Town's demands and following Motiva's September 27, 2000, letter to you also demanding that you comply therewith and correct other identified image violations at the station.
 
 
 38
 (Termination Letter at 1.) Notwithstanding the third numbered paragraph's reference to a letter from Motiva to Ceraso dated September 27, 2000, the parties agree that there was no such letter of that date.
 
 
 39
 D. The Present Action and the Judgment of the District Court
 
 
 40
 Ceraso commenced the present action in February 2001, alleging that the Notice of Termination was not based on valid grounds under the PMPA and seeking, inter alia, preliminary and permanent injunctive relief barring Motiva, without court approval, from terminating or failing to renew the franchise and from interfering with his occupation of the premises. Motiva counterclaimed, seeking a declaratory judgment that the Termination Letter effected a lawful termination of Ceraso's franchise under the PMPA. Ceraso moved for and was granted a preliminary injunction, and the matter was set for an expedited trial of the merits.
 
 
 41
 In preparation for trial, pursuant to D. Conn. L. Civ. R. 11(d), the parties submitted a Joint Trial Memorandum in which each side set forth its requests for specific findings of fact and conclusions of law. They also stipulated to the admissibility of certain documents and affidavits.
 
 
 42
 At the two-day bench trial, Ceraso did not testify. As discussed in Part II.B.2. below, Motiva called Marsala, Ascher, and former Ceraso employee Michael Seagren to testify, and introduced, inter alia, the affidavit of Joseph Gall, an elected Town representative. The affidavit stated, inter alia, that Gall had observed Ceraso's station several times a day in 1998, 1999, and 2000 and that "usually there were at least 30 cars sitting on the lot. Several times a week I saw the lot so packed with stored cars that you could not even pull in to get gas." (Affidavit of Joseph Gall, dated November 2, 2001, ¶ 9.) Gall stated that he had received complaints from members of the public that the "Texaco station at 350 Jennings Road was turning into a junkyard." (Id. ¶ 8.) Marsala and Ascher testified that a number of cars were on the premises at various times; but neither of them could say with certainty which vehicles, if any, were awaiting repair or had been repaired. Seagren, who testified that he had left Ceraso's employ after a falling out just before Christmas of 1999, said that during the last month of his employment with Ceraso there were some 15 cars a day on the premises for repairs.
 
 
 43
 Following trial, the district court found in favor of Ceraso and against Motiva. As to the scope of the issues to be resolved, the court stated that [t]he only substantive ground for termination, as permitted by 15 U.S.C. § 2802(c), set forth in defendants' compliance with the Trial Preparation order, ¶ 5, p. 69, and thus relied on in the termination of the Lease and Sale Agreement, is a violation of laws or regulations.
 
 
 44
 Memorandum of Decision and Order Re: Pending Motions, dated January 2, 2002 ("Posttrial Decision"), at 6. The court also stated, in a footnote to its findings of fact, that
 
 
 45
 [t]he termination letter is not regarded as validly invoking any basis for termination other than the alleged zoning violation. It invoked a letter dated September 27, 2000, which does not exist. It was claimed that the date was a typographical error. Defendants cannot invoke, to state grounds for termination, the intended letter of September 18, 2000, as the notice required by PMPA is limited to that which is clearly stated, see 15 U.S.C. § 2804(c)(3), which would not include an unidentified letter.
 
 
 46
 Posttrial Decision at 6 n. 3.
 
 
 47
 With respect to defendants' contention that Motiva was entitled to terminate Ceraso's franchise for violation of the Town's zoning regulations, the court found that "defendants have not proven that plaintiff was in violation of § 27.4.8.5 at a specific time nor over any identified period of time and thus have not proven a basis for the claimed termination within the grounds permitted by PMPA." Id. at 9. The court rejected Motiva's contention that Ceraso's violation of local law was established by the ZBA's decision to revoke his special permit. The court noted "the strict wording of the regulation," which "prohibits storing or parking of more than five cars awaiting repair or repaired," id. at 7 (emphasis in original), and it found that the Town's application for revocation of Ceraso's special permit did not allege a violation of the Regulation because its allegations focused on the total number of cars that were "unscreened," not just on the number of unscreened cars that were repaired or awaiting repair:
 
 
 48
 The order to comply, to which the application refers, required plaintiff to "reduce the number of unscreened vehicles to five or fewer." .... The regulation imposes no such obligation on plaintiff. Defendants agree that the regulation does not cover all vehicles. See J. Trial Mem., ¶ 12, p. 28. The ZBA action cannot be said to prove a violation of the strict wording of the regulation.
 
 
 49
 Posttrial Decision at 7.
 
 
 50
 The court also found that Motiva's trial evidence had not proven that in fact Ceraso violated the Regulation. At the start of trial, Motiva had conceded in colloquy with the court that in order to warrant franchise termination "there would have to be something more than just a very minor, isolated occasion of a literal violation" of the Regulation. (Trial Transcript November 6, 2001, vol. I ("Tr.vol.I"), at 27). After trial, the court found that Motiva had not shown more than sporadic violations:
 
 
 51
 [D]efendants are left to prove violation of the Regulation by showing that plaintiff kept or stored, for more than a nominal duration, five or more unscreened cars that had been repaired or were awaiting repairs. It cannot be found that defendants have met that burden. The evidence offered as to the cars observed on the premises does not prove plaintiff's violation as above defined. It was conceded that more than five unscreened cars were on the premises at various times. There was, however, no evidence as to how long any of the cars were observed to remain on the premises. Clearly cars came and went. Furthermore, there was no evidence as to the status or character of the cars from which it could be found that any cars so observed came within the prohibition of cars repaired or awaiting repair. There was evidence that the cars could be employees', could be unregistered vehicles awaiting disposal, could be tows awaiting claim by their owners, could be tows awaiting their owners' or insurers' determination of disposition and, if to be repaired, by whom, or could be cars of convenience store customers (a limited likelihood), none of which count toward a violation of § 27.4.8.5.
 
 
 52
 Posttrial decision at 7. The court noted that there was some evidence as to how long certain towed cars had remained on the premises. However, the Regulation applied to cars that were repaired or awaiting repair, and the documents offered by Motiva to prove the duration of the presence of towed cars on the lot "d[id] not delineate the time a car was actually being repaired, to which the Regulation, by its terms, does not apply." Id. at 8. Although noting that
 
 
 53
 there were a number of cars, probably more than five, on the premises in the months prior to the November 2, 2000 ZBA hearing[, d]efendants cannot be said to have proven that for any substantial period of time in that period, nor at any precise time, that more than five cars which had been repaired or which were awaiting repairs were in the unscreened portion of the lot for any duration beyond a nominal time.
 
 
 54
 Id. at 8-9.
 
 
 55
 The court concluded that "defendants' burden of proof on their claimed entitlement to terminate the Lease and Sales Agreement cannot be found to have been met." Id. at 8. Judgment was entered enjoining defendants from terminating or failing to renew Ceraso's franchise and from affecting his occupation of the premises on the basis of the events in dispute in this case. This appeal followed.
 
 II. DISCUSSION
 
 56
 On appeal, Motiva contends that the district court erred (a) in ruling that its Termination Letter was inadequate to terminate Ceraso's franchise for violation of the Lease's image provisions, and (b) in ruling that Motiva failed to prove that termination was proper because Ceraso violated the Town zoning Regulation. For the reasons that follow, we find no basis for reversal.
 
 
 57
 A. The Purported Termination on the Ground of Image Violations
 
 
 58
 In support of its contention that the district court erred in ruling that its Termination Letter was inadequate to terminate the franchise on the ground of image violations, Motiva argues that that letter was adequate under the PMPA to give Ceraso notice of why the franchise was being terminated and of his rights under that statute. We find Motiva's contentions unpersuasive, and we note as well a fundamental procedural reason given by the district court for refusing to rule the termination valid on the basis of image violations.
 
 
 59
 1. Motiva's Failure To Preserve the Image-Violation Ground
 
 
 60
 In its Posttrial Decision, prior to beginning the discussion section, the district court stated that "[t]he only substantive ground for termination ... set forth in defendants' compliance with the Trial Preparation order, ... and thus relied on in the termination of the Lease and Sale Agreement, is a violation of laws or regulations." Posttrial Decision at 6 (emphasis added). This statement indicates that the court did not regard Motiva as urging it to uphold the attempted termination of Ceraso's franchise on the ground of image violations. Given the contents of the parties' Joint Trial Memorandum ("JTM"), discussed below, we see no error in the view of the district court that it was not being asked to rule that termination was proper on the basis of image violations.
 
 
 61
 The JTM set forth in detail the parties' respective proposed findings of fact and conclusions of law. In that document, the parties stipulated to the contents of the September 18 Letter and of Motiva's Termination Letter. However, Motiva's only proposed finding relating to image stated that
 
 
 62
 [t]he Sales Agreement between Ceraso and Motiva, in section 16(b) and Exhibit A thereto, section 1, sets forth minimum standards for maintaining the premises in an unobstructed and uncluttered state and permits termination for a breach of those standards in section 28(m). These provisions gave Motiva grounds to terminate Ceraso for cluttering the premises with numerous stored cars.
 
 
 63
 (JTM at 59, ¶ 2 (emphasis added).) While stating that the Lease "gave Motiva grounds" to terminate for image violations, this proposed finding stopped short of requesting a finding that Motiva had in fact terminated Ceraso's franchise on that basis. Ceraso's response to this proposed finding was not only that he "disagree[d] with Motiva's characterization of the Lease Terms," but also that "in light of Termination Letter, the only relevant issue is Ceraso's compliance with the Regulation." Id. The JTM contained no other proposed finding suggesting that Motiva in fact terminated the franchise on the basis of image violations.
 
 
 64
 Motiva's "Claims of Law" section provided no indication that Motiva sought to have its attempted termination upheld on the basis of image violations. There were paragraphs in that section dealing with termination for failure to comply with applicable laws. For example, Motiva asked the court to rule that the PMPA allows a franchisor to terminate for the "knowing failure of the franchisee to comply with the Federal, State, or local laws or regulations relevant to the operation of the marketing premises" (JTM at 69, ¶ 5 (internal quotation marks omitted)), and that
 
 
 65
 [t]he PMPA expressly provides that the franchisor is authorized to terminate a franchisee — and that such termination is conclusively presumed to be reasonable as a matter of law — where: (1) the franchisee is provided notice in accordance with § 2804; and (2) the basis for the termination is the knowing failure of the franchisee to comply with the Federal, State, or local laws or regulations relevant to the operation of the marketing premises
 
 
 66
 (JTM at 70, ¶ 7). There was no similar proposition of law with regard to termination for image violations.
 
 
 67
 In addition, in responding to a number of Ceraso's JTM assertions, to which a Motiva claim of termination on the ground of image violations would have been relevant if Motiva relied on that ground, Motiva's responses made no mention of image violations. For example, in response to Ceraso's assertion that he was making efforts to settle the Town's charges of zoning violations, Motiva stated that those attempts were "irrelevant" because a franchisee has no right to cure such a violation after it has received notice of termination. (JTM at 72, ¶ 9.) Motiva advanced no argument that Ceraso's attempts to cure zoning violations were irrelevant because his franchise had also been terminated for other reasons, to wit, violation of the image provisions.
 
 
 68
 Similarly, Motiva did not dispute Ceraso's assertion that "[t]he principal factual issue in dispute [wa]s whether Ceraso violated Section 27.4.8.5" (JTM at 45, part A6). If Motiva had sought to have the court uphold its termination on the basis of image violations, the claim of image violations plainly would have presented equally important factual issues.
 
 
 69
 In response to Ceraso's proposed conclusion of law that "[t]he only allowable ground for termination which could be relevant on these facts is found at 15 U.S.C. § 2802(b)(2)(c)(11) [sic]," a section that deals with violations of law, Motiva "disagree[d]," stating that "further grounds are found for breach of the sales and lease agreements at § 2802(b)(2)(A)." (JTM at 22, ¶ 4.) However, as described in Part I.A. above, those agreements required Ceraso to, inter alia, comply with laws and regulations. Motiva did not cite any specific section or sections of the agreements to which it referred, and there was no indication in this response that Motiva referred to the agreements' image violation provisions. If Motiva sought a ruling that it had properly terminated Ceraso's franchise on the basis of image violations, it was incumbent on Motiva to respond to such Ceraso assertions with specific, informative references to the alleged image violations. There were no such references.
 
 
 70
 Finally, as noted in Part I.C. above, Motiva's Termination Letter, in referring to a prior demand that Ceraso rectify "identified image violations," cited only a nonexistent letter of September 27, 2000, and did not cite the letter dated September 18, 2000, which had listed image violations. As discussed in Part II.A.2. below, the PMPA requires that a franchisee be given clear notice of the ground asserted for termination of his franchise. In order to have the court rule that its Termination Letter properly terminated Ceraso's franchise on the basis of image violations, Motiva would have needed a ruling that the Termination Letter's reference to the nonexistent September 27, 2000 letter was a sufficiently clear reference to the letter dated September 18. In response to Ceraso's proposed findings that the Termination Letter referred to a September 27, 2000 letter that Ceraso never received and that never existed, Motiva stated only that the reference to September 27 was a typographical error that "was first discovered on October 28, 2001, making it unlikely that it caused Ceraso any real confusion or that he relied on the typo in any way to his detriment" (JTM at 20-21, ¶¶ 43, 44, 45). Motiva did not include in its own proposed findings of fact or conclusions of law a request that the court find the reference to September 27 to be a sufficiently clear reference to September 18 to give valid notice to a PMPA franchisee. Indeed, even Motiva's objection, quoted above, referred to the typographical error's discovery in the passive voice and did not actually assert that Ceraso had made or been informed of the discovery or that he so understood the Termination Letter.
 
 
 71
 In sum, one paragraph of Motiva's proposed findings of fact indicates that Motiva could have terminated the franchise on account of image violations; but nothing in the JTM either requested a finding that it did terminate on that ground, or requested a conclusion that such a termination was permissible under the PMPA, or responded to any of Ceraso's challenges to the zoning-related basis for termination by invoking, as an alternative basis for termination, the alleged image violations. We cannot conclude that the district court erred in finding that, in light of the contents of the JTM, the only ground for termination it was asked to adjudicate was Ceraso's alleged violation of laws or regulations.
 
 
 72
 2. The Termination Letter's Flawed Reference to Image
 
 
 73
 Further, to the extent that the district court may have intended to rule that there was an alternative basis for refusing to find that Motiva had terminated Ceraso's franchise for image violations, see Posttrial Decision at 6 n. 3 ("[t]he termination letter is not regarded as validly invoking any basis for termination other than the alleged zoning violation" (emphasis added)), we are unpersuaded that that ruling was erroneous.
 
 
 74
 Under the PMPA, to the extent pertinent to this appeal, proper grounds for a franchisor's termination of a franchise include a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship," 15 U.S.C. § 2802(b)(2)(A), and a "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises," id. § 2802(c)(11); see id. § 2802(b)(2)(C)(i). See generally Russo v. Texaco, Inc., 808 F.2d 221, 225 (2d Cir.1986) (termination for any of the reasons enumerated in 15 U.S.C. §§ 2802(c)(1)-(12) "is conclusively presumed to be reasonable as a matter of law").
 
 
 75
 In order to effect a valid termination, the franchisor must give the franchisee written notice of termination by personal delivery or certified mail, see 15 U.S.C. §§ 2804(c)(1) and (2), which must include "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor," id. § 2804(c)(3)(A) (emphasis added). "[T]here must be strict compliance with the notice provisions of the PMPA." Escobar v. Mobil Oil Corp., 678 F.2d 398, 400 n. 2 (2d Cir.1982); see, e.g., Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1390 (10th Cir.1981); Mobil Oil Corp. v. Clark, 652 F.2d 2, 3 (8th Cir.1981). The franchisor has the burden of showing that termination was justified and properly executed. See 15 U.S.C. § 2805(c).
 
 
 76
 In the present case, the court stated that the PMPA's requirement that a notice state the reasons for termination were not satisfied by the Motiva Termination Letter's reference to a nonexistent letter in order to provide notice of a criticism that had been communicated to Ceraso only in a letter to which the Termination Letter made no reference. We cannot conclude that this assessment was erroneous in this case. Ceraso did not testify at trial, and we have been pointed to no evidentiary basis for a finding that he knew that "September 27" meant September 18.
 
 
 77
 Further, even had the Termination Letter cited the September 18 letter, rather than the nonexistent September 27 letter, the paragraph numbered three — the only paragraph of the Termination Letter that mentioned image — was ambiguous. That paragraph set out as a reason for termination
 
 
 78
 [y]our failure to exert good faith efforts to carry out the provisions of the franchise, namely your continued practice of parking too many vehicles on the marketing premises after the Town's demands and following Motiva's September 27, 2000 letter to you also demanding that you comply therewith and correct other identified image violations at the station.
 
 
 79
 (Termination Letter at 1, ¶ 3 (emphases added).) The Town's demands, of course, related only to alleged zoning violations, and, as phrased, this paragraph could be interpreted as mentioning prior correspondence complaining of image violations only as pinpointing the time following which Ceraso made no effort to reduce the number of vehicles on the marketing premises, rather than asserting image violations as a ground in itself for the termination. Certainly we cannot conclude as a matter of law that the third numbered paragraph as written was sufficient to inform Ceraso that one reason for the termination notice was weeds, or unkempt, unswept, and obstructed bays, or unregistered vehicles.
 
 
 80
 In sum, the district court did not err in holding that, even if image-based termination were an issue in the case notwithstanding Motiva's failure to articulate that issue in the JTM, Motiva's Termination Letter was inadequate to give Ceraso notice of termination on that ground.
 
 
 81
 B. Termination Based on Alleged Zoning Violations
 
 
 82
 Motiva contends that the district court erred in concluding that it did not meet its burden of showing that termination of Ceraso's franchise was proper on the basis of zoning violations. It argues, inter alia, that the court should have given substantial weight to the ZBA decision that Ceraso violated the Town Regulation and that the court should have viewed Motiva's evidence more favorably. We find no basis for reversal in any of Motiva's contentions.
 
 1. The Action of the ZBA
 
 83
 Motiva's contention that the district court should have deferred to the decision of the ZBA that Ceraso violated the Town Regulation is meritless. The Regulation states that "no more than five (5) motor vehicles awaiting repair work or having been repaired are to be stored or parked on the lot out-of-doors," without being screened. Town Zoning Regulations § 27.4.8.5 (emphasis added). The Revocation Application filed by Marsala in October 2000 for revocation of Ceraso's special exception permit, although quoting the Regulation, alleged as facts the following:
 
 
 84
 In December of 1999, I issued Mr. Ceraso an Order to Comply with § 27.4.8.5. Specifically, Mr. Ceraso was to reduce the number of unscreened vehicles on the property to five or fewer. He has failed to comply with my Order....
 
 
 85
 .... Because Mr. Ceraso has been in violation of § 27.4.8.5 of the Regulations, the Commission has the authority to revoke his Special Exception....
 
 
 86
 For the above reasons, in my capacity as Zoning Enforcement Officer of the Town of Fairfield, I respectfully request that Mr. Ceraso's Special Exception certificate for approval to use the location at the above property be revoked by this Board.
 
 
 87
 (Attachment to Revocation Application at 1-2.) The application contained no allegations as to how many cars were on the premises awaiting repair or having been repaired. Thus, the application did not allege a violation of the Regulation as written.
 
 
 88
 The ZBA voted to grant Marsala's application without making any findings. Given that the ZBA made no findings and gave no express instructions, its decision apparently contemplated that in order to avoid loss of his permit, Ceraso must reduce to no more than five the total number of unscreened vehicles on the property — regardless of whether they had been or were to be repaired. Accordingly, the ZBA imposed on Ceraso an obligation different from that on the face of the Regulation.
 
 
 89
 "Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply." Double I Limited Partnership v. Plan & Zoning Commission, 218 Conn. 65, 72, 588 A.2d 624, 628 (1991) (internal quotation marks omitted). The board's "action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." Id. Here, the ZBA's decision was subject to review in state court, and Ceraso had indeed appealed that decision. No definitive state-court ruling on the ZBA's interpretation was ever forthcoming, however, because Ceraso and the Town agreed to a settlement that did not involve revocation of his permit.
 
 
 90
 The district court found that the ZBA action "cannot be said to prove a violation of the strict wording of the regulation" because "[t]he terminology in the [Revocation A]pplication does not state a violation of, or noncompliance with, the actual wording of the Regulation." Posttrial Decision at 7, 6. In light of the disparity between the language of the Regulation and the allegations of the application, and in light of the absence of any findings by the ZBA, we see no error in the district court's treatment of the ZBA's decision as a less-than-reasonable interpretation of the Regulation. The district court properly rejected Motiva's contention that it should rule that Ceraso had violated the Regulation simply on the basis of the ZBA decision.
 
 
 91
 2. Motiva's Trial Evidence With Respect to Zoning Violations
 
 
 92
 Finally, Motiva contends that the evidence it presented at trial was sufficient to show that Ceraso violated the Regulation and hence that Motiva's termination of the franchise on that basis was valid. For the reasons that follow, we reject this contention as well.
 
 
 93
 The PMPA provides that "[t]he franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that [its] termination or nonrenewal was permitted under section 2802(b) ...." 15 U.S.C § 2805(c). Thus, after the franchisee has presented evidence of a termination or nonrenewal, the burden is on the franchisor to prove that its action was permitted by the PMPA. See, e.g., Four Corners Service Station, Inc. v. Mobil Oil Corp., 51 F.3d 306, 310 (1st Cir.1995); Clinkscales v. Chevron U.S.A., Inc., 831 F.2d 1565, 1569 (11th Cir.1987). There is no dispute that Motiva sent the Termination Letter informing Ceraso that his franchise would be terminated for violations of the zoning Regulation. Thus, Motiva had the burden of proving that Ceraso had violated the Regulation.
 
 
 94
 The district court's findings of fact after a bench trial are not to be overturned unless they are clearly erroneous. See, e.g., Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). This standard applies whether those findings are based on witness testimony, or on documentary evidence, or on inferences from other facts. See, e.g., id. at 574, 105 S.Ct. 1504; Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1176 (2d Cir.1995). In reviewing findings for clear error, we are not allowed to second-guess either the trial court's credibility assessments or its choice between permissible competing inferences. See, e.g., Anderson v. Bessemer City, 470 U.S. at 573-74, 105 S.Ct. 1504. Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous. See id. at 574, 105 S.Ct. 1504. The weight of the evidence is not a ground for reversal on appeal, see, e.g., Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir.1993) (per curiam), and the fact that there may have been evidence to support an inference contrary to that drawn by the trial court does not mean that the findings are clearly erroneous, see, e.g., Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 618 (2d Cir.1991). The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," Anderson v. Bessemer City, 470 U.S. at 574, 105 S.Ct. 1504; see United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).
 
 
 95
 The district court here, focusing on the terms of the Regulation, found that Motiva's evidence was insufficient to persuade the court that, during the period in question, there were more than five unscreened cars that had been repaired or were awaiting repair on any precise date or for any more-than-minimal duration. We see no clear error in that finding.
 
 
 96
 Plainly, none of the testimonial evidence required a contrary finding. For example, although Marsala testified that he had counted the number of cars on the premises, he admitted that he had not determined whether any of the vehicles were awaiting repair or had been repaired. His failure to make that determination is hardly surprising given his apparent misimpression, as revealed in both the initial Order To Comply and the Revocation Application to the ZBA, that the Regulation limited the total number of unscreened cars without regard to their repair status.
 
 
 97
 Ascher testified that he had estimated the total number of vehicles on the lot on each of his visits, placing that number at 25 to 35, excluding vehicles in the bays, in a fenced area, and at the gasoline pumps. But he too conceded that he had no information as to the repair status of any of the vehicles. And although the Gall affidavit colorfully stated the view that there were too many cars on Ceraso's premises, it likewise provided no information as to the vehicles' repair status.
 
 
 98
 The one trial witness who appeared to have any information as to the number of cars on the premises that were repaired or awaiting repair was Seagren, who had been the manager of Ceraso's towing operation. Seagren testified that while he dealt primarily with the towing business, he also dealt with customers needing repairs; that he had written some repair orders and released some repaired cars; and that he personally knew of the status of "basically every car that was on the lot." (Tr. vol. I, at 55.) He estimated that during the last month he worked for Ceraso, about 15 cars a day were on the premises for repairs. The pertinence of his testimony, however, was superficial. First, the court, which had the opportunity to assess Seagren's demeanor and credibility, apparently found his testimony not believable to the extent that Seagren claimed to have personal knowledge beyond facts relating to vehicles that had been towed from accidents or breakdowns, see Posttrial Decision at 3-4, an assessment we cannot overturn. More importantly, Seagren was employed on Ceraso's premises for only a minuscule part of the period covered by the Town's zoning complaints. The Town's initial Order To Comply was dated December 17, 1999. Seagren testified that, after a "falling out" (Tr. vol. I, at 90), he left Ceraso's employ "just before Christmas of '99" (id. at 47). Thus, although the period covered by the Town's zoning complaints was more than 10 months, Seagren's personal contact with Ceraso's operations during that period was limited to no more than one week. Even assuming that Seagren's estimates were accepted for that single week, which immediately followed the Town's initial Order To Comply, the court plainly was not required to accept his estimates as proof of conditions at any other point in the 10-month period. Finally, Motiva's first written warning to Ceraso, stating that his franchise would be in jeopardy of termination if he did not comply with the Town's zoning orders, was the letter dated September 18, 2000. By the time of that warning, Seagren had been gone from Ceraso's employ for nearly nine months; he apparently had no first-hand knowledge of the repair status of any cars on Ceraso's premises at any time near the point at which Motiva threatened or attempted to terminate the franchise. In sum, we have seen no testimonial evidence that required a finding that, at the times pertinent to Motiva's notice of termination, Ceraso violated § 27.4.8.5.
 
 
 99
 Nor do we see any clear error in the court's finding that Motiva's documentary evidence was inadequate to show the pertinent number of cars on Ceraso's premises during the relevant period. Although some documents showed dates on which cars were towed to Ceraso's station and dates on which payments were received, the court found those documents unpersuasive in the absence of additional information. It noted that some payments could have been merely for towing, with repairs to be made by companies other than Ceraso's; in other instances, payment could have been made for repairs after the cars had been picked up by their owners. In neither circumstance would the car in question have been repaired or awaiting repair for all of (or perhaps any part of) the period between the two dates recorded on the documents. The court found that other documents, while revealing the dates on which a car had arrived at and left the premises, "d[id] not delineate the time a car was actually being repaired, to which the Regulation, by its terms, does not apply." Posttrial Decision at 8. The court also found that the documents did not necessarily reveal how long a car was waiting to be picked up after repairs had been completed, stating that some short but reasonable amount of time — which would not have been controllable by Ceraso — must be allowed for the owner to pick up a car following its repair. In light of the above assessments, we cannot say that the court erred in finding Motiva's documentary evidence less than sufficiently probative.
 
 
 100
 Motiva contends that there was no evidence to support certain of the district court's statements, such as that some of the cars on the premises could have belonged to Ceraso's employees or that the repair bays and screened area of the premises could accommodate certain numbers of cars. We see no basis for reversal in these statements, which we regard as observations as to various respects in which there were simply gaps in Motiva's proof. It was incumbent upon Motiva, which bore the burden of proof, to provide sufficient evidence to persuade the court as to the repair status of unscreened cars on Ceraso's premises during the pertinent period. We see no clear error in any of the court's findings, nor any error in its ultimate ruling that Motiva did not carry its burden.
 
 
 101
 The judgment in the present case adjudicated only the events related to Motiva's November 13, 2000 attempt to terminate Ceraso's franchise. Nothing in that judgment or in our affirmance precludes a renewed attempt by Motiva to terminate the franchise if there are subsequent violations of Ceraso's obligations.
 
 CONCLUSION
 
 102
 We have considered all of Motiva's arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.